THE MAYOR AND COMMON COUNCIL OF JERSEY CITY v. THE MORRIS CANAL AND BANKING COMPANY AND THE LEHIGH VALLEY RAILROAD COMPANY.

The charter of Jersey City provides that the owner or occupier of any house, lot, or tenement *where water shall be taken*, shall each be liable for the payment of the prices fixed by the board of public works for the use of water. The city, for its own convenience, placed a meter on the lands of the defendants, for the purpose of measuring the water flowing through a main in the street. The defendants did not use any of the water flowing through the meter. In an action to recover the price of water flowing through and measured by the meter, which was furnished to and used by third persons, on other premises, which was taken by them from the main below the lot where the meter was located, *held*—

1. That, independent of a statutory provision making the owner of lands fronting on a street on which water is supplied, liable to assessment under a system of taxation for paying the expenses of bringing water into the city, the obligation to pay water rates will arise only on a contract, express or implied, from the circumstances under which water is furnished.

2. That, under the charter of Jersey City, water is taken, within the meaning of the section referred to, at the place where it is delivered for use, and not at the place where it is measured.

3. That the defendants are not liable for the price of water furnished by the city to third persons, and on their credit, which was taken from the main below the place where the meter was located, and used by such third persons, on other premises, not belonging to the defendants.

In *assumpsit.* On rule to show cause why a verdict for the plaintiff should not be set aside.

Argued at June Term, 1878, before BEASLEY, CHIEF JUSTICE, and Justices DEPUE and SCUDDER.

For the rule, *J. F. Randolph* and *T. N. McCarter.*

*Contra, Leon Abbett.*

The opinion of the court was delivered by

DEPUE, J. This action was brought by the city against the defendants, under the eighty-first section of the city charter, passed March 31st, 1871. *Pamph. L., p.* 1131. The section, so far as is material, is in the following words: "That the said board of public works shall regulate the distribution and use of the water in all places and for all purposes, where the same may be required, and from time to time shall fix the prices for the use thereof and the times of payment, and may erect such number of public hydrants, and in such places, as they shall see fit, and direct in what manner and for what purpose the same shall be used; all of which they may change at their discretion; and the owner or occupier of any house, lot, or tenement where water shall be taken, shall each be liable for the payment of the price so fixed; and the said board shall also, from time to time, fix a sum, to be assessed annually, upon all vacant lots, and lots with buildings thereon, in which Passaic water is not taken, if the same are situated upon any road, street, avenue, alley, or court, through or in

which pipes for distributing the water are laid, which prices and sums so fixed and assessed shall be denominated water rents."

The suit is not brought against the defendants as the owners of lots situate on a street through which water pipes are laid, for the sums assessable on such premises as water rents, where the water is not taken. It is founded on a demand for water taken during the years 1875 and 1876, and the verdict is for the same at the rates chargeable for water actually taken.

The water, in fact, was drawn and used by the firm of Canfield & Co., without the direction, consent, or knowledge of the defendants, and they received no benefit from its use. It was charged on the books of the water board to Canfield & Co., and they were the only persons known to the city officials in connection therewith.

The question for examination is whether, under the facts in evidence at the trial, the defendants are such owners as, by force of the section quoted, are liable for water furnished to, and used by third persons, without their knowledge or consent.

The defendants were owners of a lot of land lying on tide water, on the south side of Essex street, in front of which they had constructed a wharf. The lands on the north side of Essex street were owned by the American Coal Company, which had also constructed a wharf in front of their premises. Canfield & Co. were lessees of both wharves, under leases from their respective owners, made to Quintard & Co., under whom Canfield & Co. were sub-lessees. The city laid a water main on the middle line of Essex street, as far as the line of the bulkhead; from that point, the main was diverted to the extreme north side of the street, and was carried down there to the front of the dock of the coal company. The water charged for was obtained by Canfield & Co. from three hydrants and a tank, located on the northerly side of the street, in front of the wharf owned by the coal company, and below the line of the bulkhead. It did not appear in the case that any portion of the water was used by Canfield &

Co. for any purpose immediately connected with the dock property leased of the defendants, and the location of the main below the bulkhead, and of the hydrants and the tank on the extreme northerly side of the street, indicated the contrary to be the case. Indeed, the counsel of the plaintiff does not rely for a recovery on the ground that the water was used by the defendants' tenant for the beneficial enjoyment of the premises demised by them. He puts his right of action exclusively on the fact that the meter by· which the water flowing through the main was measured, was located on the defendant's lands.

The meter was located on the defendants' lands just outside of the line of the street, and above the line of the bulkhead. All the water flowing through the main was carried through and measured by this meter by means of a pipe leading from the main to the meter, and then immediately carried back to the main by means of another connecting pipe. The plaintiffs' counsel contends that the water is taken, within the meaning of the city charter, when it passes through the meter, and that the owner of the lands on which the meter is placed is the owner of " any house, lot or tenement where water shall be taken," so as " to be liable for the payment of the price so fixed." I am unwilling to adopt this construction of the section in question. The quantity of water used must undoubtedly be determined by the registry of the meter, and in the absence of satisfactory evidence that its measurement is erroneous, its conclusions must be accepted as the correct measurement of the quantity consumed. But independent of a statutory provision making the owners of lands fronting on a street on which water is supplied, liable to assessment under a system of taxation for providing the means to defray the expenses of bringing water into a city, the obligation to pay water rates will arise only upon a contract express or implied. Such a contract will arise from the actual use of water by the party sought to be charged, and may be implied from the circumstances under which it was furnished, though used by others. This distinction is recognized in the section quoted.

It provides for assessments, at one rate, "upon vacant lots and lots with buildings thereon in which Passaic water is not taken," and for rates graduated by the quantity of water taken, the distribution and use of which the board of public works is authorized to regulate, and from time to time to "fix the prices for the use thereof, and the times of payment."

The action being brought not for the rates assessable on lands in cases where water is not taken, but for the price of water used, the city, if it can recover, must do so on the basis of a contract with the defendants for the payment thereof, express or implied. The case does not present any circumstances from which such an undertaking on the part of the defendants can be implied. The meter was the property of the city and under its control. It remained on the defendants' lands, for the exclusive benefit of the city, as a convenient point to measure the water flowing through the main. The water, the price of which was sued for, was furnished to Canfield & Co. on their credit, and was taken by them out of the main for use at places which were not on the plaintiffs' lands, and the price was charged to that firm on the books of the water board. The payment on account was also made by them. Whatever contract for payment existed was a contract exclusively with that firm.

As between the city and Canfield & Co., the meter may be regarded as the place at which the water was taken, so far as the ascertainment of quantity is concerned. But in the sense which is material in this case, the water was not taken at that point. In its usual signification, the word *taken* implies a transfer of possession, dominion or control. A thing is not taken unless such a change of *status* is effected. In trespass, trover or replevin the *taking* is not accomplished until the goods are within the power or control of the defendant. A devisee *takes* under a will only when the possession and control of the devisor has ceased. After the water was measured in the meter it flowed back into the city's main and continued within its control. If, in fact, the city did not exercise control over it after it passed the meter, it did so of its own

North Hudson Co. Railway v. Hoboken.

volition, for the reason that its employés chose to adopt this method of measurement while the water was in transit, and before it reached the place where it was to be delivered for use. At the latter place the water was taken, within the meaning of the city charter.

Nor was the notice of December 8th, 1875, an admission of an antecedent contract on the part of the defendants. It was given simply as a means of precaution to avoid the possibility of a claim by the city in the future, on the grounds on which this action was endeavored to be supported.

The verdict should be set aside.